J-A07037-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.T.S.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1546 MDA 2023 |

Appeal from the Order Entered October 30, 2023
In the Court of Common Pleas of Centre County Orphans' Court at No(s):
2022-4611 A

BEFORE:   STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED: APRIL 30, 2024**

J.T.S.S. ("Father") appeals from the October 30, 2023 order involuntarily terminating his parental rights to his biological daughter, K.L.S., born in March 2016.[1]  In this Court, Father's attorney, Lance T. Marshall,

---

[*] Former Justice specially assigned to the Superior Court.

[1]  The termination proceedings addressing the above-captioned case also implicated petitions to involuntarily terminate the parental rights of K.M.L. ("Mother") as to the Child and her four siblings, H.H, born in April 2008; K.H., born in September 2009; P.L., born in October 2010; and R.L., born in April 2018 (collectively, "the Children").  *See* Notes of Testimony ("N.T."), 10/20/23, at 4-5.  Additionally, Centre County Children and Youth Services ("CCCYS" of "the Agency") also sought to involuntarily terminate the parental rights of Mother's former paramour, C.B., to his son P.L.  *See id.* at 5. Ultimately, the court terminated the parental rights of C.B. and Mother pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8).  *See id.* at 251-53.  It is unclear from the record before us whether Mother or C.B. appealed these findings.  In any case, the validity of the court's dispositions with respect to Mother and C.B. are not before us.
*(Footnote Continued Next Page)*

Esquire, has filed an application to withdraw and a brief pursuant to **_Anders v. California_**, 386 U.S. 738 (1967), asserting that Father's appellate claims are frivolous.[2]   After careful review, we affirm the order involuntarily terminating Father's parental rights and grant Attorney Marshall's application.

The certified record indicates that CCCYS has been working with this family for several years.  **_See_** N.T., 10/20/23, at 33.  The Agency's most recent involvement began on January 8, 2020, after it received a report that K.H. had presented at school with a black eye.  **_See_** N.T., 10/20/23, at 21.  Upon further investigation concerning the home shared by Father and Mother (collectively, "Parents"), CCCYS learned that K.H. had attempted to prevent Father from physically disciplining H.H, and that Mother had struck K.H. with a "closed fist."  **_See id._** at 21-22.

Under separate questioning, H.H., K.H., and P.L. each independently disclosed to the Agency that incidents of "domestic violence" and "inappropriate physical discipline" were regularly occurring in the home.[3]  **_See id._** at 23-24, 49, 57.  Due to the family's history of criminal activity and prior

_____

We similarly note that Father has a younger daughter, R.S., who is approximately three years younger than the Child.  R.S. did not participate in these proceedings, nor is she otherwise implicated by them.  **_See id._** at 164.

[2] We note that **_Anders_** applies in the context of termination of parental rights appeals.  **_See In re Adoption of B.G.S._**, 240 A.3d 658, 661 (Pa. Super. 2020)

[3]  At the time of these initial events, the Child was three years old and not capable of providing information to the Agency.  **_See_** N.T., 10/20/23, at 30.

involvements with CCCYS, concerns were also raised regarding drug and alcohol abuse in the home. *See id.* at 57.

On January 9, 2020, the Agency was awarded emergency protective custody of K.L.S. in connection with these concerns, which was confirmed at a shelter care hearing held one day later in conformity with 42 Pa.C.S.A. § 6332(a). On February 7, 2020, K.L.S. was adjudicated dependent with an initial permanency goal of reunification with Parents.[4] She was first placed in kinship care with her maternal grandmother and her siblings. *See* N.T., 10/20/23, at 31. One month later, K.L.S. was removed from kinship care due to safety and financial concerns. *See id.* at 32, 66-67. Following a number of temporary placements, she was transferred to her current foster home in November 2022 with pre-adoptive foster parents ("Foster Parents"), where she has remained since.[5] *See id.* at 107, 150.

Between January and February 2020, Parents continued to cohabitate and had biweekly visitations with, *inter alia*, K.L.S. On February 19, 2020, Father was arrested and incarcerated on criminal charges of strangulation, terroristic threats, stalking, simple assault, and harassment, which he had

---

[4] In a permanency review order filed February 22, 2022, the dependency court established a concurrent goal of adoption with respect to the Child. *See* Permanency Review Order, 2/22/21, at 2. No appeal was filed.

[5] At the time of the termination hearing in the above-captioned case, it was anticipated that Child and her siblings would be placed with Foster Parents, who had committed to adopting all of them. *See* N.T., 10/20/23, at 126-27.

allegedly committed against Mother. *See* Permanency Review Order, 7/17/20, at 1. Ultimately, Father pled guilty to a summary count of harassment and was incarcerated. Following a period of residency in a halfway house, he was released from supervised custody in September 2021. *See* N.T., 10/20/23, at 92, 152. During this time period, he did not participate in reunification services or have any known contact with K.L.S.[6] Parents' relationship ended during Father's incarceration.

Upon his release from custody in September 2021, Father began to engage in the reunification process. In the service agreement executed between the Agency and Father, he agreed to: (1) participate in reunification services; (2) maintain his sobriety; (3) participate in substance abuse, mental health, and domestic violence treatment; (4) communicate appropriately with others; and (5) maintain healthy relationships free from violence and narcotics. *See id.* at 92-100. In permanency review orders entered between January 2022 and April 2023, the court rated Father's compliance with these objectives as moderate. Concomitantly, however, the court also uniformly rated Father's progress towards achieving reunification as minimal.

Upon his release from custody in September 2021, Father also began to participate in regular supervised visits with K.L.S. *See id*. at 153. Beginning

_____

[6] Indeed, the dependency court initially found that visitation between Father and the Child would be contrary to the Child's safety and well-being. *See* Permanency Review Order, 9/10/21, at 3.

in June 2022, the visits between Father and K.L.S. progressed to unsupervised and overnight visits. Ultimately, however, the court suspended Father's visits in June 2023 after he ceased participating in services. *See id.* at 156, 188-89. Father's last visit with K.L.S. occurred on June 7, 2023. *See id.* at 156.

On November 22, 2022, the Agency filed a termination of parental rights ("TPR") petition seeking to involuntarily end Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[7] The orphans' court held a TPR hearing on October 20, 2023, at which time K.L.S. was seven years old. Therein, the Agency adduced testimony from CCCYS caseworkers Tyrus Lundy and Vanessa Gordon.[8] CCCYS casework supervisor Jaclyn Conway also testified. The Agency also introduced various documentation related to K.L.S.'s dependency case. Foster Parents attended but did not testify.

Although Attorney Marshall was present, Father did not appear for the proceeding. Several minutes after the hearing was scheduled to begin,

---

[7] On September 8, 2023, the orphans' court appointed Carolyn Larrabee, Esquire, to represent the Child's legal interests in this matter. The Centre County Public Defender's Office was separately appointed to act as the Child's guardian *ad litem* in these termination proceedings. *See* Order, 10/16/23, at 1. Thus, we observe no structural error in the instant case. *See Interest of K.N.L.*, 284 A.3d 121, 151 n.23 (Pa. 2022) (holding appellate court must perform "limited *sua sponte* review" to confirm orphans' court's appointment of legal counsel in conformity with 23 Pa.C.S.A. § 2313(a)).

[8] Specifically, Ms. Lundy was assigned as the primary caseworker on this case from January 2020 through May 2020. *See* N.T., 10/20/23, at 29. An interim caseworker who did not testify at the hearing handled this case from May 2020 through August 2020. *See id.* at 140. Finally, Ms. Gordon assumed responsibility for the case beginning in August 2020. *See id.*

Attorney Marshall contacted Father via cell phone, at which point Father reported he was having "car trouble," and would be late to the proceedings. N.T., 10/20/23, at 11. Attorney Marshall requested a continuance, which was universally opposed by counsel for CCCYS, C.B., and Mother. *See id.* at 11-12. Ultimately, the orphans' court denied the request for a continuance and the TPR hearing went forward without Father present. Despite his earlier claim that he would arrive belatedly, Father did not appear at the hearing.

On October 30, 2023, the orphans' court filed an order that involuntarily terminated Father's parental rights to K.L.S. On November 9, 2023, Father filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[9] On December 7, 2023, the court submitted a responsive Rule 1925(a)(2)(ii) opinion explaining its rationale for involuntarily terminating Father's rights.

Attorney Marshall has filed both an application to withdraw pursuant to *Anders* along with a brief expressing his belief that Father's potential appellate claims are frivolous. Accordingly, we will begin our review by considering Father's counsel's petition to withdraw and the accompanying brief. *See B.G.S.*, 240 A.3d at 661 ("When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without

---

[9] We note that Father's notice of appeal and Rule 1925(a)(2)(i) statement were submitted as a single document. *See* Notice of Appeal, 11/9/23, at 1. Although we do not believe that submitting a consolidated filing in this manner constitutes a "best practice," we discern no impediment to our review.

first passing on the request to withdraw."). In order to withdraw pursuant to **Anders**, counsel must: (1) petition the court for leave to withdraw and aver that, after making a conscientious examination of the record, he has determined that an appeal would be frivolous; (2) furnish a copy of the **Anders** brief to the appellant; and (3) advise the appellant that they have the right to retain private counsel or bring additional arguments to the court's attention. **Id.** To confirm that client notification has taken place, counsel must provide this Court with a copy of the letter advising the appellant of his or her rights in conformity with **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005). **See B.G.S.**, 240 A.3d at 661.

Our Supreme Court has also set forth substantive requirements for counsel's **Anders** brief, which must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes would arguably support the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. **Id.** (citing **Commonwealth v. Santiago**, 602 Pa. 159, 178-79, 978 A.2d 349, 361 (Pa. 2009)). Therefore, a fully compliant **Anders** brief should "articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous." **Id.**

Instantly, counsel has submitted both a petition to withdraw and an **Anders** brief averring that Father's appeal is frivolous. Attached to counsel's

application is a *Millisock* letter dated December 28, 2023, indicating that counsel provided copies of his application, the brief, and transcripts of the October 20, 2023 hearing to Father. *See* Application to Withdraw as Counsel, 12/28/23, at Exhibit A. This letter properly advised Father of his right to retain alternative counsel or raise supplemental arguments on his own.[10] *See id.* Our review similarly confirms that counsel's *Anders* brief provides a cogent and well-cited summary of the factual and procedural history of this matter. *See* Anders Brief at 9-13. Furthermore, the brief contains an orderly and well-researched discussion of governing law. *See id.* at 15-28. While counsel refers to several lines of argument that might support Father's appeal, he explains that these potential points of contention are frivolous in light of the evidence supporting the orphans' court's termination of his parental rights.

Based upon the foregoing, we conclude that counsel has complied with the procedural requirements attendant to *Anders*. Therefore, we will proceed to review the issues outlined in Attorney Marshall's brief and "conduct an independent review of the record to discern if there are any additional, non-frivolous issues overlooked by counsel." *B.G.S.*, 240 A.3d at 662 (quoting *Commonwealth v. Flowers*, 113 A.3d 1246, 1250 (Pa. Super. 2015)). In particular, we will focus upon the two specific issues raised by Attorney Marshall: (1) the orphans' court's denial of Father's request for a continuance;

---

[10] Father has not tendered a response to counsel's application to withdraw.

and (2) the validity of the termination holding pursuant to the Adoption Act, 23 Pa.C.S.A. §§ 2101, *et seq*. ("the Act"). **See** Anders Brief at 15-28.

We will begin our review by considering the orphans' court's denial of Father's request for a continuance. "The matter of granting or denying a continuance is within the discretion of the [orphans'] court." **In Interest of D.F.**, 165 A.3d 960, 964 (Pa. Super. 2017). We will not disturb an orphans' court's determination absent an abuse of discretion. **See id.** at 965. In this context, "[a]n abuse of discretion is more than just an error in judgment and, on appeal, the [orphans'] court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the results of partiality, prejudice, bias, or ill-will." **See id.**

This Court has specifically discussed the issue of continuances and a parent's non-appearance at a TPR hearing, as follows:

> [N]either the [Act] nor the cases interpreting it require that a parent must be present in order for a court to grant a petition to terminate parental rights. The Act merely requires that 'at least ten days' notice shall be given to the parent . . . whose rights are to be terminated, by personal service or registered mail to his . . . last known address or by such other means as the court may require.' 23 Pa.C.S. § 2513(b). . . .

> Once a court is satisfied that a parent has received notice of the hearing, it is then entirely within the trial court's discretion to make a ruling on the continuance request based on the evidence before it. As in all matters involving parental rights, the best interests of the child are paramount. Accordingly, the exercise of the trial court's discretion includes balancing the evidence submitted in support of the request against other relevant factors, such as a parent's response and participation, or lack thereof, in prior proceedings and appointments important to the welfare of the child. Most importantly, the trial court is in the best position

to factor in the impact that further delay will have on the child's well-being.

*Id.* (internal capitalization cleaned up).

In its Rule 1925(a)(2)(ii) opinion, the orphans' court explained that there was no dispute that Father received proper notice of the termination hearing. *See* Orphans' Court Opinion ("O.C.O."), 12/7/23, at 3 ("Proper notice was not an issue; testimony established that service of the TPR petition and scheduling order had been personally made, and [Attorney Marshall] and [Father] planned to meet at the courthouse before the hearing began on October 20."). The orphans' court also noted that scheduling the hearing had been "very difficult" and that granting a continuance would have "resulted in another period of delay" with respect to K.L.S.'s permanency. *See id.* at 4. Finally, the orphans' court did not find Father's eleventh-hour claim to be credible. *See id.* ("[T]he court was also somewhat skeptical of the proffered reason for [Father's] absence, car trouble, particularly given that the effort to contact counsel or the court about the difficulty was meager, at best.").

Our independent review confirms that the orphans' court's conclusions are well-supported by the certified record. Initially, there is no dispute that Ms. Gordon personally served Father with both notice of the TPR hearing and a copy of the termination petition filed by CCCYS on August 31, 2023, *i.e.*, well within the ten-day period required by statute. *See* N.T., 10/20/23, at 11-12, 58-60; 23 Pa.C.S.A. § 2513(b). Indeed, the Agency proffered a copy of the mandatory statutory notice bearing Father's signature at the TPR

hearing. *See* N.T., 10/20/23, at 58-60. The transcript of the TPR hearing reveals that accommodating the conflicting schedules of the seven separate attorneys involved in this matter had proven difficult and taken nearly one year since the filing of CCCYS's TPR petition. *See* N.T., 10/20/23, at 11-13.

Moreover, there were inconsistencies in Father's claims concerning his sudden unavailability on the day of the hearing, which lend credence to the orphans' court's conclusion that Father's averments were not credible. Attorney Marshall represented to the court that he and Father had communicated the day before the hearing and had planned to meet early on the morning of the hearing. *See id.* at 6. This planned rendezvous did not occur. *See id.* Thereafter, Father did not proactively reach out to Attorney Marshall, but only claimed to be experiencing car trouble once counsel reached out to him. *See id.* at 6-7, 11. In speaking to Attorney Marshall, Father claimed he would appear "in about an hour and a half." *See id.* at 11.

Although the orphans' court denied Father's request for an immediate continuance, we note that a significant pause in the proceedings took place shortly thereafter due to a natural gas leak outside of the courthouse. *See id.* at 69-70. Although the exact timing of these events is not perfectly documented in the certified record, we discern that Father had more-than-sufficient time in which to fulfill his claim that he could appear at the courthouse despite his alleged automobile issues. Despite Father's assertion, he did not appear as promised. *See id.* at 11-70 (representing a significant

passage of time between Father's initial claim and the resumption of proceedings following an evacuation of the courtroom). We observe no abuse of discretion in the court's finding that Father's request was incredible.

Finally, we also find that sufficient grounds exist in the certified record to support the orphans' court's concerns regarding the effect that further delays of the proceedings would have had upon K.L.S. As detailed above, it took nearly a year to schedule the TPR hearing in this case. *See id.* at 11-13. At the time of the TPR hearing, K.L.S. had been removed from Father's care for nearly four years. At the TPR hearing, Ms. Gordon testified that the long duration of these proceedings was having a deleterious effect upon K.L.S., who desires permanency and to be adopted by Foster Parents. *Id.* at 109.

Based upon the foregoing discussion, we discern no abuse of discretion in the denial of Father's continuance request.

We now turn to examine the validity of the court's termination holding. Our standard of review in this context is well-settled:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the

- 12 -

facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines that the petitioner has established grounds for termination under at least one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court's determination as to "any one subsection

of [section] 2511(a), in addition to [section] 2511(b), in order to affirm the termination of parental rights." **T.S.M.**, 71 A.3d at 267.

Similar to Attorney Marshall in his **Anders** brief, our analysis in this case will focus upon Section 2511(a)(8) and (b), which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> . . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy section 2511(a)(8), the petitioner must prove that:

(1) the child has been removed from the parent's care for at least 12 months;

(2) the conditions which led to the removal or placement still exist; and (3)

- 14 -

termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). In this, the statute recognizes "that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

If a petitioner establishes adequate grounds for termination pursuant to section 2511(a), we then turn to section 2511(b), which requires that the court "give primary consideration to the developmental, physical and

emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our

Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

The extent, however, of the "bond-effect analysis necessarily depends

on the circumstances of the particular case." *In re Adoption of J.M.*, 991

A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Rather, it is within the province

of the orphans' court to "consider the totality of the circumstances when

performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned

up). This Court has clarified that it is "within the discretion of the orphans'

court to prioritize the safety and security" of children "over their bonds with

their parents." *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

We will begin by assessing the orphans' court's holding pursuant to section 2511(a)(8).[11] There can be no dispute that K.L.S. had been removed from Father's care for approximately 46 months at the time of the termination hearing, *i.e.*, well beyond the 12-month time frame contemplated by the statute. Thus, the first prong of section 2511(a)(8) is well-established.

Turning to the second aspect of section 2511(a)(8), we also observe that the conditions that precipitated K.L.S.'s removal continue to exist. Specifically, K.L.S. was removed due to concerns about domestic violence and substance abuse concerns. It is evident to this Court that Father's violent and angry behavior have persisted throughout this case. He was incarcerated or in supervised custody from February 2020 through September 2021 due to

---

[11] Father failed to preserve any arguable challenge to the orphans' court's findings with respect to section 2511(a) in his Rule 1925(a)(2)(i) and (b) concise statement. Rather, it appears that Father purported to raise only a challenge to the orphans' court's findings pursuant to section 2511(b). *See* Notice of Appeal, 11/9/23, at 1 (challenging only the orphans' court's alleged failure "to consider the best interests of the child" in terminating Father's parental rights). Litigants who fail to preserve specific challenges to the different subsections of section 2511(a) in their concise statements waive such claims for the purposes of appellate review. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("With respect to issues not included in a concise statement, our Supreme Court has instructed that this Court has no discretion in choosing whether to find waiver. Waiver is mandatory, and this Court may not craft ad hoc exceptions or engage in selective enforcement."). Such waiver would preclude Father from making any non-frivolous challenge to the court's section 2511(a) findings. *See id.* Nonetheless, out of an abundance of caution we will consider the merits of Father's potential claims.

his behavior towards Mother. ***See*** N.T., 10/20/23, at 92, 152. Even after his incarceration ended, CCCYS received reports in January 2022 that Father was making threats of physical violence against members of his paramour's family. ***See id.*** at 100. Ms. Gordon also testified that in November 2022 Father became angry, aggressive, and verbally abusive towards the Agency's staff during a session. ***See id.*** at 98-99. Father also failed to complete a batterer's intervention program recommended by CCCYS. ***See id.*** at 93-94, 103-04.

Similarly, the certified record reflects that Father has failed to maintain his sobriety throughout these proceedings. Between November 2021 and April 2023, he tested positive for multiple illicit narcotics on numerous occasions, including amphetamines, methamphetamines, cocaine, and non-prescribed opioids. ***See id.*** at 94-98. During this same time period, Father also regularly tested positive for alcohol and tetrahydrocannabinol ("THC"). ***See id***. at 94-95. Although Father has a legitimate medical marijuana prescription in Pennsylvania, CCCYS nonetheless raised concerns that he was inappropriately mixing medical marijuana with alcohol throughout this case. ***See id.*** at 95.

Based upon the foregoing evidence, we also find no abuse of discretion or error of law in the orphans' court's finding that the second prong of section 2511(a)(8) was satisfied with respect to Father, *i.e.*, that the concerns and issues which precipitated K.L.S.'s removal continued to persist.

The third and final facet of section 2511(a)(8) requires us to consider whether termination of Father's parental rights will best serve the needs and

welfare of the child. In its Rule 1925(a)(2)(ii) opinion, the court opined at length that termination was in K.L.S.'s best interests. **See** O.C.O. at 5-6. This finding is well-supported by the record.

We emphasize that one critical concern regarding Father's domestic violence issues was his reliance upon inappropriate physical discipline in the home. **See** N.T., 10/20/23, at 57. Coupled with the violent and aggressive behavior that Father has displayed towards adults, there are clear and ongoing safety concerns regarding Father's interactions with K.L.S.

These safety concerns are further buttressed by Ms. Gordon's testimony detailing an assessment she conducted while K.L.S. was participating in an overnight visit with Father on or about August 8, 2022. During this visit, Ms. Gordon reported that Father presented as being visibly intoxicated. **See id.** at 97. Ms. Gordon testified that during her visit, K.L.S. was "very scared," refused to speak, and would not make eye contact. **See id.** at 96. During the time period when K.L.S. was participating in visits with Father, she also experienced frequent nightmares and episodes of bedwetting that the Agency attributed to her ongoing interactions with Father. **See id.** at 88, 118-19.

Relatedly, Ms. Gordon relayed that K.L.S. had expressed a clear and unambiguous preference that she be adopted by Foster Parents:

> [K.L.S.] has very specifically told everyone at [the Agency] that's involved in this case she does not ever want to move again, that she just wants to be adopted. And she was very disappointed to learn that this was not her adoption hearing. She thought today was the day that she would be adopted and was very disappointed to hear that that was not the case.

- 19 -

*Id.* at 109. Overall, we observe no abuse of discretion or error of law in the orphans' court's findings with respect to the third aspect of section 2511(a)(8). Accordingly, we agree that Father's claims with respect to this part of the court's findings pursuant to section 2511(a) are frivolous.

Finally, we will consider the propriety of termination in light of section 2511(b), which affords primary consideration to the developmental, physical, and emotional needs and welfare of the child. 23 Pa.C.S.A. § 2511(b). With respect to the mandated bonding assessment, we note that the certified record indicates that Father and K.L.S. share a bond with one another. *See* N.T., 10/20/23, at 54-55, 156. The record reveals, however, that it is not a necessary and beneficial bond. Rather, Child shares a beneficial parental bond with Foster Parents, by whom K.L.S. wishes to be adopted. *See id.* at 109. In her testimony, Ms. Gordon confirmed Foster Parents are capable, willing, and committed to serving as adoptive parents to K.L.S. *See id.* at 167-68.

Considering this bonding assessment in conjunction with the unabated safety concerns regarding Father noted above in our discussion of section 2511(a)(8), we find no abuse of discretion or error of law in the orphans' court's finding with respect to section 2511(b).

Overall, our independent review confirms that Father is not entitled to relief and we are satisfied that the record does not contain any non-frivolous issues overlooked by Attorney Marshall. Therefore, we grant counsel's petition

to withdraw under the framework of **Anders** and we affirm the order of the orphans' court involuntarily terminating Father's parental rights to K.L.S.

Application to withdraw granted.  Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/30/2024